Thank you all for allowing my client the opportunity to be heard today on this appeal, or I should say appeals. Get over behind the mic, would you please? Yes, I'm sorry. We do have two appeals in the case, and there are several issues. But I'd like to start with the district court's grant of summary judgment on the cause of action for breach of the nondisclosure agreement in the case. May I ask you just a little bit of a preliminary question? I wanted to make sure I'm understanding that the summary judgments as to trade liable, statutory unfair competition, common law unfair competition were not appealed. That's correct. They were in the notice of appeal, and we elected not to pursue those issues. All right. And if I read through, just trying to clear up, we're not going forward on the declaratory relief either. Well, that's addressed. I mean, it wasn't addressed in the opening brief. I guess it's not addressed specifically. It's mentioned that it's one of the contract claims, and it's part and parcel with the breach of the NDA claim. And the fraudulent misrepresentation really isn't pled now. We're not talking about fraudulent misrepresentation. We're talking about promissory estoppel by fraud, which is a different theory, which was not pled before. Well, the misrepresentation claim is based on the promise to contract statements by various people at a Home Depot through the course of the relationship. And I think the promissory estoppel by fraud is just an argument, a way to argue the misrepresentation that was made. Well, it isn't really a fraudulent misrepresentation claim. At least it wasn't over in district court where I was all my life. If you want a promissory estoppel, that's a different claim, not fraudulent misrepresentation. And so I felt like the fraudulent misrepresentation had been abandoned as well. Now, I'm more than happy to go back to those you are talking about, which are breach of nondisclosure and trade secrets and motion to strike and attorney's fees. Those are always there, and I think we had a lot to do, but I just wanted to clear up some of those preliminary issues. All right. Thank you. Okay. Let me ask in connection with the estoppel argument, did you plead facts in the complaint that really lend themselves to that theory? Your Honor, to be truthful with you, the fraud claim was more of a notice type of pleading. It wasn't that specific. And that the fraud claim developed through discovery, through the deposition testimony of the HD employees to support the claim, as well as the deposition testimony of Ms. Moncure, who is the representative for anti-T. Now, going to the breach of the nondisclosure agreement claim, we have to understand that with respect to a nondisclosure agreement, and in this agreement the definition of what is and what isn't confidential information, confidential information does not have to be a trade secret. So it's a different analysis. Something can be confidential information and yet still not be a trade secret. And I think that's one of the misunderstandings that the district court had in granting the motion for breach of the nondisclosure agreement. Now, when we look at the nondisclosure agreement, we're talking about two things. It's called a nondisclosure agreement, but there are terms regarding restrictions on disclosure as well as restrictions on use. And in this agreement, the items of confidential information that was agreed would only be used in the evaluation of a transaction that was being discussed between the parties. Now, that transaction was a contract for a software piece that Rent IT was requested to develop for Rent IT or for Home Depot. So the context of the nondisclosure agreement was the facilitation of these discussions concerning a transaction. Now, in that regard, Home Depot knew that the software that it wanted didn't exist, and that's really why they brought Rent IT in for their expertise, their subject matter expertise, with respect to the tool rental industry as well as the software industry to develop the solution for the Home Depot. Now, one thing you have to keep in mind is that Home Depot never returned any of Rent IT's confidential information that they claimed was confidential. So in any case, that in itself is a breach of the agreement. But this more relates to the trade secret argument. I guess you can look at them both, confidential information and trade secret, looking at what did Home Depot do with this information. How did they use it? Did they disclose it, and did they use it? Now, with respect to the disclosure issue, we know that Rent IT's business requirements and use cases were disclosed to third-party vendors. And we know from Ms. Moncure's deposition testimony that she objected to that disclosure. But the Home Depot assured her not to worry, that this was just part of the process of getting Rent IT finally selected. So that use was improper, but Rent IT was assured that it was necessary to get Rent IT selected as the provider of the software. And also, I might add that when Home Depot did disclose those materials to these third-party vendors, Home Depot itself included a confidentiality provision in those agreements. So the confidential information and potential trade secret information was protected by those agreements. Now, when we speak about the use of the information, there were three areas we learned through the deposition of Home Depot's creditors. One of those areas, according to Mr. Haddox, where the Home Depot utilized Rent IT's business requirements. And according to Mr. Haddox's testimony, the business requirements were used, let me make sure I get the right reference here, were used to make enhancements to Home Depot's existing software with respect to the automatic printing of safety sheets and maintenance information. Now, with respect to this electronic storing and automatically printing of the safety sheets and manufacturer's information regarding maintenance, under Home Depot's existing system, it's all about the legacy type software system that they had. How they operated, they had what they called tooltips on a clipboard that they would tear off, and it would be up to the Home Depot associate employee to give the correct tooltip to the customer. So there was really no system in place to ensure that these tooltips were correct for the type of equipment rented, or to ensure that the customer received the tooltips or documented the customer with the correct tooltip. Now, the planned future of Rent IT's software would ensure that the manufacturer's up-to-date information concerning maintenance steps, safety information, operator instructions, and recommended accessories was electronically obtained from the manufacturer and then tied to the customer contract. So when a customer contract was prepared, the system would automatically print the information with the customer contract tied to the customer number or the contract number, therefore ensuring that the customer received the correct information, the correct up-to-date information, and ensuring that there would be a record that the information was provided to the customer. Now, this has obvious implications with respect to reducing Home Depot's liability with respect to customers' rentals. Now, this feature, as disclosed by Rent IT to HD, was described in the business requirements documents. It was also described in the deposition testimony of Ms. Moncure and Mr. Nguyen, who was also a principal of Rent IT, and Lawrence Kay. We also had Mr. Nguyen's deposition at the record at E.R. 1619 through 1623, where he explained the same process that they were going to employ of getting the safety sheets from the manufacturer that were up to date and time to the contract, and the importance was that the manufacturer would be, the contract would provide these up to date safety sheets, so the manufacturer would stand behind it, limit the liability of the Home Depot. We had the deposition of Larry Kay, who was Rent IT's expert at the record at 1934, and he discussed the safety sheets associated with the rental contract, and how it was wired so that when there's a connection to the contract, to the manufacturer, with the contract number, nobody else does that, and this is something that was unique to Rent IT and that they were going to implement. We also had evidence that this stuff was implemented by Home Depot, and at tab 18, it's E.R. 833 through 944. These are Home Depot's system requirements and specifications for their enhancements, including this particular enhancement, and then we had there at tab 28, it's E.R. 1696 through 727. This is Home Depot's training guide with respect to the enhancements, including this particular enhancement that was developed by Rent IT. And now, the business requirements were just one element. We also had the trade, or the rate calculation, and the disclosure of that, and the fact that the rate calculation was part of Rent IT's process of developing a software, and that it was necessary to, when they finally do the conversion on the software piece from the old software to the new software, it was important to have the contracts that Home Depot had outstanding match the contracts that would be output by Rent IT's software, so the formula had to be the same. But didn't your expert admit that a rate a company charges for rental services is not a secret? Well, that would be true if the software is released, because the customer can determine the rate. But this was a software piece that was in development. This was a rate that wasn't, it's not even a rate, it's a method, it's a process for calculating this additional hour charge, so it's really not a rate that the customer sees. But Home Depot might have an argument if this was a software piece that was on the market. It wasn't, it was something that was in development that was going to be developed, so it had economic value because it had a unique way to calculate this additional hour method that nobody else uses. Well, but in effect, wasn't it a way of calculating rental rates, not known in the industry, but it wasn't, but because it just gave you an increased rate, customers get higher prices generating new revenue? Does that make it a trade secret? Well, it's more than that. Mr. Wynn went in and conducted an analysis of Home Depot's existing system. And he, looking at their system of using one-tenth of a half-day to determine their additional hour, that didn't make sense to him. Their software calculated at one-fourth, which makes more sense. But it's something that Mr. Wynn developed, not something that Home Depot developed. None of their industry experts within the company, their consultants, nobody ever conceived or thought to analyze this structure and to make the change that Rent IT was going to make in the software. So this was something that was going to derive substantial revenue for the Home Depot, and in fact it did. It's something that was going to be employed in Rent IT's software. And the fact is that Home Depot took that piece and implemented it the same month that they terminated all discussions with Rent IT. And I think we did show this as a trade secret. I mean, in hindsight, it's easy to say, oh, it's simple. And like Home Depot argued, anybody with a calculator could have figured that out. But the fact is, anybody with a calculator didn't figure it out. Terry Wynn figured it out. And Larry Kay testified that his calculation is even below the industry norm for calculating these types of charges. And he testified that Mr. Wynn's experience and knowledge and his know-how, which can constitute a trade secret, know-how, that the customer wouldn't balk at this charge and this would fly with the customers and would work and be profitable for Home Depot, that was all part of the trade secret. I know I didn't get on everything, but I think I'd better reserve some time. I only have two minutes left. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. In assessing this appeal, I think... Daniel Bromberg for Home Depot. Your Honors, in analyzing this appeal, I think one thing that's crucial is to look at what's actually in the record and what was actually raised below and in the briefs, because that's far different, I would submit, from what my colleague has suggested, and it shows far less than they would have this Court believe. Take, for example, the business requirements, which are really one of the basis of their claims. Now, those requirements are in volume two of the excerpts of record at page 355, and I'm just going to get my copy. If you look through these business requirements, it's hard to identify anything that leaps out as being either a trade secret or anything that would qualify as confidential information under the nondisclosure agreement. And plaintiffs have not identified any provisions, except I think for the first time today, they pointed to RA 13, but before that, they hadn't identified any one of the 395 items that are in the business requirements that would qualify as a trade secret. And a lot of the stuff that's in here is, frankly, pretty mundane. If you look at the mutual nondisclosure agreement and you read the definition, the C part of the definition says, information or materials that the disclosing party treats as confidential and does not disclose publicly. Now, if I read those words, and I'm supposed to be now looking at this contract and give its absolute, plain, on-the-face definition, how can the business requirements not fit that? Well, Your Honor, I think there's several reasons. One is the question of whose information it is in the business requirements. Well, there's two. It's theirs and yours. Well, Your Honor, they haven't identified any information that they actually added. Now, they say that there was a lot of information that they put in there, but you can comb through the record and you won't see an identification of one item in the business requirements that they actually provided. And that's crucial for a couple of reasons. First of all, and I'm just going to get my copy of the contract. If you look at Section 8 of the contract, which I think is on page 238 of the appendix, Section 8 excludes from the use restrictions any information that the receiving party knew prior to the agreement being entered into. So they can't claim that there's any violation of the nondisclosure agreement based upon information that was supplied by Home Depot or that Home Depot knew previously. They simply haven't identified anything in the business requirements that is information that was solely supplied by Rent IT. Furthermore, the context is important here. Now, there were two things that were going on in this case. One was software development and the other was the business requirements. Now, initially, Rent IT was approached because of the expertise of their principals in the area of rental software. And the question was, how do you adapt an SAP platform to the kind of functionality that you need to have for rental software? That happened in the fall of 2003. Now, in February of 2004, Craig Haddix, who was on the operational side of the Home Depot's tool rental division, he received a request from the IT department that said, create these business requirements, the use cases, and the process flows. He was expected to do that himself, but he didn't have the resources to do it. He initially thought, well, I'll get business analysts to help me out, but he realized that he couldn't do that in time. So he brought in Rent IT to step into Home Depot's shoes and describe the business requirements. There was no contemplation at that point that there would be any trade secrets that would be included. And the business requirements, Your Honors, don't fit as being information of Rent ITs. First point is that they were commissioned by Home Depot. They reflected primarily information that Home Depot supplied and Home Depot's practices. And they were paid for by Home Depot. Well, to be specific, they are a document detailing every specific requirement that would be necessary in a SAP-based tool rental software program. So they took the information that Home Depot gives to them, and then they adopt that into what they had to do for business requirements. And to make the program go, and then they give it back to them. They had things like user interface, security, billing, warranty, fleet purchasing, all of those in a program specifically developed, which Home Depot could not develop themselves in a program well developed in order to put it into the system. And then they gave it back. Well, Your Honor, I would differ with you on the fact that Home Depot couldn't have developed it itself. Well, they didn't do it themselves. They asked them to do it. They didn't have the time to do it themselves. Mr. Haddox was expected to do it himself, but he didn't have the time. But that's not really the important point. The important point here is whether this document, which is at best a combined document with some ideas from Rent IT, but most ideas from Home Depot, whose document that's considered to be. And you have to look, I think, first of all, at paragraph 17 of the nondisclosure agreement. That's the no commitments clause, and it says there is no obligation to create anything that constitutes confidential information. Well, Rent IT is claiming that the business requirements are confidential information, and clearly the deal that was made was that they would create these business requirements. So there's a clear tension, a contradiction between that provision and the interpretation that they're offering. But isn't that, on summary judgment, we shouldn't then rule for? Because if the contract is ambiguous on its face, and we need to have everybody giving testimony as to what it is and what it isn't and what it means and what it doesn't mean, that's when summary judgment should not be rendered by the district court. We should then have a trial, because it's only when it's clear and unambiguous on its face, and we can interpret it without any parole evidence whatsoever. That we don't have a trial. Otherwise, we have a trial. Well, Your Honor, I don't think that there are any disputed facts here. I mean, there are material disputed facts. There are claims by Rent IT about its understanding of the purpose of the agreement. They're not backed up by any objective manifestations by Home Depot. But, Your Honor, it's not important to resolve this particular issue, because there are other grounds on which the Court can affirm the summary judgment ruling. Let me ask, wasn't this confidentiality agreement signed at the behest of Home Depot? They really wanted it. Yes, Your Honor. And the reason that they did is because when the business requirements were being made, the way that they were created is... So we're going to interpret any ambiguity against them? You would after having gone through every other evidence resolving any ambiguities, any genuine issues, Your Honor. Let me go back to where I was starting before with respect to the trade circuits. I think, Judge Smith, as you pointed out, there hasn't been any identification of the trade circuits. Mr. Barnhill has done, I think, a much better job at oral argument and pointing to places in the record where there might be such evidence. But none of those things were pointed out to the district court below, and they weren't, I don't think, in their briefs before this Court, either. So that can't save them on that. Now, with respect to the business requirements, I would submit it's very clear that the safety sheets and the metering, that those are the most important things. There's nothing in there that constitutes a trade secret. I've read through the business requirements several times. The only reference I've been able to find to safety sheets is in, I think, RA1. It's on page 365. And it's just a bare mention. They say safety sheets is one thing that you should be able to do. There's a mention of charging for usage on page 370. So only the most general concepts were disclosed. But the evidence in the record is clear. It's undisputed that those general concepts were known in the industry. If you look at pages 445 through 47 of the transcript, you'll see testimony from Ms. Moncour as one of the principals of Rent IT. And there she admits that industry-leading software already had these features of automated printing sheets and the feature of metering. Furthermore, Home Depot had already identified both safety sheets and metering as a place where it was lagging behind its competitors. There is a strategic planning document. That's at page 578 of the appendix. And it lists things that Home Depot's competitors were doing that Home Depot wasn't. And two of the things are safety sheets and metering. Now, I pointed you to section 8 of the nondisclosure agreement previously. And that says things that you knew about before, concepts that you knew prior to the nondisclosure agreement, you're not prevented from using those. So what they say about the enhancements to the legacy system with respect to safety sheets and metering, that was okay. That was clearly authorized by the nondisclosure agreement. They also raised the question of environmental costs. But there's no evidence of what exactly that is, much less as showing that that was Rent IT information or how it was used. Now, Mr. Barnhill went through and described in some detail some aspects of the safety sheets and metering. But there's no evidence that that was ever implemented. There's certainly nothing that was in the briefs or argued previously below. There's some other problems with the contract claim as well. Now, one claim that they make is that the business requirements shouldn't have been included in the RFI and that whole process that took place in the spring of 2004. Problem is they haven't shown any damage from that. The purpose of the RFI was to determine which vendor Home Depot would look to for this software development process. Well, the vendor that they selected was Rent IT. Rent IT won that process. They didn't suffer any damage from that. They've also had problems showing, substantiating the millions of dollars in damages that they're seeking based upon the contract claim. Well, Your Honor, they did lose profits, but they haven't shown that that was caused by any breach of the nondisclosure agreement. Now, they certainly didn't lose the software development contract because of the inclusion of the business requirements in the RFI. Because as I said, they got through that hoop. They didn't lose it because of the rental rate calculation, because they claimed that was part of the cutover to the new system. And as far as the legacy enhancements, well, those all took place in the summer of 2004, and negotiations were still ongoing through 2005. So there's no causal connection there. They haven't shown that the disclosure or the alleged misuse of the business advice that they gave in the business requirements identifying what Home Depot should want out of a system and the rental rate calculation, they haven't shown that any of that disclosure of that business advice affected their ability to get the software development contract. They lost the software development contract for a number of reasons. It wasn't death by a thousand cuts, but there were a number of important problems that they ran into. It was cost, as the Du Bois Intuition Report showed. There was SAP, which was supposed to be a prime contractor, which withdrew. There were the questions about scalability. There was the fact that they failed the solutions design review, and ultimately the fact that this whole project was to adapt an SAP platform, which Home Depot never adopted for its tool rental division. Let me ask you another question, which is some latitude here. The judge struck all of their expert witnesses. Yes, Your Honor. Under Federal Rules of Procedure 26A2B, why should they have been struck? They weren't specifically retained or employed to provide the expert testimony. It wasn't their primary duty to give this testimony, but they were giving them as employees.  Well, Your Honor, they didn't need a written report if they're not in those categories. So if you strike all the expert witnesses who provide the testimony that would be needed to provide the question of fact, and then you say there's no question of fact, it's pretty easy to get there. Because what we're really relying on, even in what you've now been suggesting or discussing, are your testimony from your witnesses, and his witnesses struck because they didn't give written reports, and yet the rules suggest they ought to have been allowed to give it without written reports because they're employees. They're not specially provided experts, and all they are is an employee coming in to give testimony as to what they knew. And now they're struck, and we're left with this record. Well, Your Honor, two responses to that. One is the lower courts are split over the application of Rule 26 in a situation like this. Some courts have used an analysis similar to the one that you've outlined. Others have looked to the overall purpose of those provisions and recognized that they apply in a situation like this. Well, how do I get around the clear reading of the rule? A to B doesn't say, well, I'm going to look at everything else in the rules and say if it's really applicable or not. That's the place where you've got to look and know whether you allow it or you don't. Well, Your Honor, we chose not to focus on that issue in our briefs, largely because it doesn't affect the outcome in this case. There's no showing that any of the testimony that was struck would create a genuine issue. Since there were no reports, are we sure we know what that testimony would have been? Well, Your Honor, it certainly wouldn't affect the main problem with the trade secrets. And the main problem is the failure to identify what those trade secrets were. You don't need an expert to say it's item number 322 in the business requirements that's the trade secret. Plaintiff simply hasn't identified what those trade secrets are, and for that reason alone, their trade secret claim fails. Well, now with the trade secret claim, the thing that's most concerning to me, and again, we've got the same judge on a lot of our cases. It seems like this time we're doing judge real a lot, but in this particular situation, he awards fees and then he doesn't tell us why he gives them. Or the amount. Or why he gives that amount. And our precedent's pretty specific. If you're going to award fees on a misappropriation of trade secrets, tell us why. Tell us what the situation is. In this kind of a setting, make specific findings of rate and hours. It has to be determined reasonable. Make some findings about why you're doing what you have to do. If you don't give any specific findings under Frank Musick, you don't get anything. And here we are now. Judge real's not the first judge I've seen somewhat similar to that. There were those in Idaho who did that as well. They said, okay, counsel, go paper it up after they'd made a decision. But then it's up to you to paper it up. And when you've papered it up, we don't have any reasonable explanation either. And probably because you didn't know. Well, Your Honor, there are two issues there. One is the question of whether attorney's fees were appropriate. And the other is the amount of the fees. Now, let me address the amount of the fees first because that seems to be your primary concern. That's where I am. I mean, give him discretion on whether it's appropriate. And I may not agree that this is misappropriation of trade secrets, and I may let him back in. But if he's correct, how do I get to the amount? Well, Your Honor, you have to remember that this is an abuse of discretion standard. I know. So tell me what you're going to say so I can tell whether you abused it or not. I think that the ‑‑Your Honor, and I'm not defending Judge Reel's failure to or the failure to describe the fees in sufficient amount. Now, when we proposed the order, we'd suggested that he give the entire $500,000 that we had sought. Judge Reel cut that down to $150,000. We know why. We don't, Your Honor. But I would suggest that that was a low enough percentage that it clearly qualifies as being reasonable. And the reason is you need to look at all the claims in the case. Now, there were seven claims that were originally brought. One of them was the declaratory judgment action, which is sort of a tag-along. There were three that, as you pointed out, were dismissed at a very early stage, the trade libel claim and the two unfair competition claims. So really this case was litigated with respect to three claims, the trade secrets claim, the contract claim, and the fraud and misrepresentation claim. The award here is, I think we said, a quarter in our briefs. It's really like about 21 percent of the overall amount of costs, expenses that were incurred. We think that 21 percent, given one of the ‑‑for one of the three major components of the case, is sufficiently low that it was reasonable. Now, with respect to one case that says that's the way you do it, I mean, that's my problem. When you're going to do this and you know that there's got to be an abuse discretion, it seems to me that if a lawyer was supposed to paper this up for Judge Reel, or Judge Reel ought to tell me what to do and why. And if he doesn't, then it seems to me that I've got to send it back to have him paper it up. Well, Your Honor, if that's what the court feels it must do, then that's what the court must do. I would point out one thing with respect to the liability issue, whether attorneys' fees should be awarded. And here's one place where we actually do have something from Judge Reel about what happened. If you look at page, I think it's 1323 in the transcripts, you'll see that Judge Reel asked Mr. Barnhill twice, what's the trade secret here? And Mr. Barnhill didn't answer the question. That is a threshold requirement for trade secrets, and a party that refuses to answer a question on that at oral argument twice, I think shows not only objective speciousness, but also consciousness of it as well. I see I have almost no time left. Thank you very much. I'll let you submit on the briefs. Thank you.   There was discussion regarding damages, and counsel was arguing about Rent IT losing the contract. The issue is not whether Rent IT lost the contract. The contract price is a way of evaluating the damages, but the issue is misuse of confidential information and misappropriation of trade secrets. And so if you determine that confidential information was misused or trade secrets were misappropriated, then you can look at the agreement in principle that Rent IT had, and we referenced these project requests that were executed by Home Depot, so the contract terms were agreed upon and it was just a matter of getting the final signature up by the attorneys. You can look at the agreement in principle to measure the damages. So I think that's an important distinction. Now, with respect to the business requirements, we have Ms. Moncure's deposition testimony that she prepared all of those requirements, that they weren't prepared by Home Depot, that it wasn't a collaborative process. Now, Home Depot argued to the contrary, but they didn't produce any evidence to show that it was a collaborative process. So what we have is Ms. Moncure's testimony that she prepared these things, and how did she do it? She did it by looking at what Home Depot did, determined what they were doing wrong, and then came up with a process, a new process for a software piece that was going to be based on SAP to solve all the problems that a big tool rental company like HT would have in renting tools, and to do it in a way that would put Home Depot in a market that it wasn't in, that it didn't even conceive of. Rent IT, they were the subject matter experts hired by Mr. Haggs, because he recognized the need to have outside experts to determine these functions. Mr. Haggs also admitted in his deposition that all of the rental functions in the business requirements, and those are designated by an RA, and then there's some overlap with some of the other number designations, that all of those were Rent IT-developed pieces, that they didn't document Rent IT's processes, or Home Depot's processes, that Rent IT developed these. I'm out. You are out of time. I'm going to let you give one more sentence, but since you're ready to say I'm out. Oh my, thank you very much. Thank you. Cases C, or Cases 0655829 and 0656259 are hereby submitted. We will now call Case 0655936, Raymond Manzurek, or Manzurek, I don't know exactly how you say that, versus St. Paul Fire and Marine Insurance Company.
judges: Goodwin, Fletcher, Smith